Tomás Encarnación et al., Plaintiffs and Appellees, *v.*
Luis Jordán, Defendant and Appellant.

No. 11415.   Argued March 2, 1955.—Decided June 30, 1955.

*Ramón H. Vargas* for appellant. *Luis G. Estades* and *Canales & Segarra* for appellees.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

This is a suit filed by 25 workmen against their employer Luis Jordán, a mosaic manufacturer. In their complaint they claim an increase of wages as stipulated in the collective bargaining agreements in force from November 1947 until December 1952, and which increase they allege was not paid to them.

After the complaint was answered and the trial held, the lower court rendered judgment dismissing the complaint as to twenty of the petitioners for having failed to appear and sustain their claim and, as to the other five, it ordered the defendant to pay them the sum claimed in the complaint, plus an equal sum as penalty and costs including $250 for attorney's fees. Feeling aggrieved, defendant appealed.

The petitioners were affiliated with the Syndicate of Workmen of the Mosaic Industry.[1] On November 20, 1947, the Syndicate and the owners of the mosaic factory of San Juan and Río Piedras, one of whom was respondent Luis Jordán, signed a collective bargaining agreement which took effect on November 9 of that same year and continued for a period of a year. Part (*d*) of § IV of said agreement provided:

"(*d*) During the effectiveness of this agreement the employers agree to pay to the workmen employed by the hour who at present earn 32 cents per hour, 35 cents per hour; the other workmen who work by the hour shall receive an increase of 2 cents per hour. Every new workman shall receive a minimum wage of 32 cents per hour."

Subsequently the relations between the employers and the Syndicate were governed by collective bargaining agreements

---

[1] This Union was a filial of the General Confederation of Workmen of Puerto Rico.

which were in force for a year. With respect to the wages, these agreements provided:

"Section IV (*d*). During the effectiveness of this agreement the workmen shall receive the same wages which they are receiving at present. . . ."

The trial court held that the petitioners, Pedro Díaz, Santiago Collazo and Miguel Ángel Alers, who began working for the respondent after the signing of the collective bargaining agreement of November 20, 1947, were entitled to receive the increase of 3 cents, provided in § IV (*d*) of said agreement, 30 days after they began to work. In his first assignment the appellant alleges that the trial court erred in construing § IV (*d*) of the agreement in the manner stated above. He contends that every workman who began working after the signing of the said collective bargaining agreement would be considered a "new workman" under § IV (*d*), and, therefore, entitled to receive a minimum wage of 32 cents per hour, which was the wage paid to these three workmen during the period comprised in their claim.

Appellant is correct. We have seen that § IV (*d*) of the collective bargaining agreement provides that "the employers agree to pay to the workmen employed by the hour *who at present earn* 32 cents per hour, 35 cents per hour; . . . ." (Italics ours.) Obviously this increase of 3 cents covered those workmen who at the time of signing the agreement were earning 32 cents per hour. We cannot give another construction to the phrase "who at present earn 32 cents per hour." Said section further provided that "the other workmen who work by the hour shall receive an increase of 2 cents per hour." It is also clear that this provision referred to those workmen who were already working for the employer, appellant herein, at the time the agreement was signed, and who received a wage other than 32 cents per hour. In providing that the other workmen who work by the hour "*shall receive an increase of 2 cents*

*per hour,"* it prescribed an increase of 2 cents per hour for the workmen who already received specific wages per hour. Both increases, that of 3 cents and that of 2 cents per hour were, therefore, for the workmen who already worked for the appellant and who were the ones negotiating the agreement. Obviously, the workmen who *were not working could not receive* an increase in their wages. But § IV(*d*) further provided that: "Every new workman shall receive a minimum wage of 32 cents per hour." This provision, in our opinion, established the minimum wage for the workmen who began working for the employer after the signing of the collective bargaining agreement.

■ The controversy between the parties hinges on this last provision of § IV(*d*) and specifically on the meaning of the phrase "new workman." The trial court, basing its opinion on a Union Shop clause [2] included in the agreement signed on August 22, 1951, held that the condition of *new workman* "because of the spirit itself of the entirety of the clauses of all the agreements, which the evidence shows were

---

[2] Said clause provided:

"UNION SHOP CLAUSE"

It shall be a requirement for employment that every workman employed at present with the employer or who might be employed in the future shall be a 'bona fide' member of the contracting labor organization known as the Syndicate. Provided, that as a condition for continuing in his employment every workman, who at the time of negotiating this agreement is working for the employer and who is not affiliated with the labor organization which is a party to this contract—is granted a term of thirty (30) days from the time this agreement is signed to become affiliated with the Syndicate. Every new person employed by the employers after the signing of this agreement is bound, as a condition for employment, to become affiliated with said Syndicate within the thirty (30) days pointed out herein. The Syndicate shall notify the employer in writing of the nonfulfilment on the part of the workman of the provisions of this section and the employer shall then remove the workman from his employment immediately after receipt of such notice. Provided, however that this clause shall not be in force until after a majority of the employees within the appropriate unit, for collective bargaining purposes, authorizes its approval by means of elections conducted by the National Labor Relations Board.

the same, was enjoyed by any person who coming for the first time to the industry had thirty days to become affiliated with the Syndicate and who would receive during that period a minimum wage of 32 cents per hour. Thereafter he either left the industry or became affiliated with the Syndicate in order to enjoy all the rights of a member. We fail to see how the Syndicate could increase its number of members and thus obtain more fees from the workmen, if the new workman had to continue earning 32 cents per hour the same as the minimum to which he was entitled when he began working. The affiliation should have an incentive and that, in our opinion, would have to be that the workman would earn, after the month granted for his affiliation with the Syndicate, the 35 cents per hour stipulated for the workmen who at the time of signing the agreement earned 32 cents per hour."

It must be observed, in the first place, that the collective bargaining agreement signed in November, 1947, did not contain the aforesaid union-shop clause. At any rate said clause has no connection with the wages nor does it affect the scale of wages. This clause established, as a condition for employment, that the workman be a "bona fide" member of the Syndicate. The workmen who were already employees were granted a term of thirty days after the signing of the agreement (August 22, 1951) to become affiliated with the Syndicate. "Every new person employed by the employers after the signing" of this agreement was bound to become affiliated with the Syndicate within thirty days in order to continue being employed. This does not mean, as the trial court concluded—accepting for the sake of argument that the union-shop clause had appeared in the agreement of 1947—that a *new workman* is one who works the first thirty days when he has been employed after the agreement is signed and that once said term expires he loses his condition of new workman for the purposes of § IV (d). On the contrary, the language used in the union-shop clause means

rather that the *new workman* is the "new person employed by the employers after the signing of this agreement . . ." The first error was committed.

■■ After settling the conflict in the evidence in favor of the petitioners, the trial court made the following finding of fact:

"4.—That the petitioners, Dionisio Salcedo and Tomás Collazo, began working for the respondent prior to the signing of the collective bargaining agreement of November 20, 1947."

The appellant had introduced in evidence certain notebooks containing, as he alleged, his payrolls for the years 1947–50, for the purpose of corroborating his testimony to the effect that the two workmen, to which the former finding of fact refers, had begun working for him after, and not before, the 1947 agreement was signed. The court refused to admit the evidence and on this refusal he bases his second assignment of error.

The court, after examining the notebooks introduced in evidence by the appellant, determined that the workmen were not properly identified therein and that the notebooks did not show the rate of wages or the days worked. Said notebooks have not been sent up to this court and consequently the appellant has not placed us in a position to decide the error assigned. It is proper to state, however, that the trial court permitted the appellant to testify that the payrolls would reveal that Dionisio Salcedo began to work for him in 1950. Notwithstanding this the court did not give credit to his testimony. The error, if any, is harmless. *Cf. Heirs of Maldonado* v. *Maldonado*, 43 P.R.R. 649.

■ In the third and last assignment of error the appellant challenges the pronouncement of the trial court ordering him to pay, besides the unpaid wages, an equal sum as liquidation of damages.

We have previously stated that the workmen are claiming herein certain increases in the wages stipulated in col-

lective bargaining agreements. This is not a case where the employer pays to said workmen a minimum wage lower than that fixed for the mosaic industry or where the wages they received were less than the wage customarily paid in the locality for similar work. The collective bargaining agreement provided that the workmen who earned 32 cents per hour would earn 35 cents per hour. In other words, that these workmen would receive an increase of 3 cents per hour in their wages. The employer did not pay the increase stipulated to the workmen, Dionisio Salcedo and Tomás Collazo, but continued paying the wage rate of 32 cents per hour. Said workmen now claim the unpaid increase of 3 cents per hour.

The appellant urges that the Federal Fair Labor Standards Act (29 U.S.C.A. 216), the Minimum Wage Act of Puerto Rico, and Act No. 379 of May 15, 1948, which were the only statutes authorizing the recovery of the sum equal to the sums unpaid as liquidation of damages, were not applicable to the appellees' claims. On the other hand, the latter allege that the pronouncement challenged is supported by § 13 of the aforesaid Act No. 379 of 1948.

Considering that the workmen-appellees do not accuse their employer of a violation of the Federal Fair Labor Standards Act, or of any decree, order or resolution of the Minimum Wage Board of Puerto Rico, the question involved herein is narrowed to determining whether, under Act No. 379 of 1948, the appellees are entitled to the additional compensation as liquidation of damages.

Section 13 of said Act provides:

"Section 13.—Any employee who receives a compensation *less than that fixed by this Act* for regular hours and extra hours of work shall be entitled to recover from his employer, through civil action, the sums unpaid, plus an equal sum as liquidation of damages, in addition to the costs, expenses, and attorney's fees of the proceeding. (Italics ours.)

In discussing this third error the appellant rests his arguments on the phrase " . . . who receives a compensation *less than that fixed by this Act* for regular hours. . . ." (Italics ours.) He contends that Act No. 379 does not fix any compensation for regular working hours and that in the absence of any other law or any decree of the Minimum Wage Board fixing a minimum compensation for the mosaic industry, he is not bound to pay to the workmen, in addition to the unpaid sums for regular hours of work, an equal sum as liquidation of damages.

We disagree. Section 13 must be construed jointly with the other provisions of the Act. It is true that Act No. 379 does not fix minimum wages as does the Federal Fair Labor Standards Act. That was unnecessary since in Puerto Rico the minimum wage and other working conditions are fixed by mandatory decrees of the Minimum Wage Board. However, by this we do not mean to say that Act No. 379 does not prescribe the payment of a specific compensation for the regular working hours. In its § 19 it defines "Labor Contracts" as follows:

" 'Labor contract' means every oral or written agreement by which the employee binds himself to execute a work, perform labor, or render a service for the employer for a wage or any other pecuniary remuneration. If there is no express stipulation as to wages, the employer shall be obliged to pay the minimum wage fixed for the occupation, industry, or business in question, and, in default of such determination, the wages that are customarily paid in the locality for similar work."

That provision imposes on the employer the obligation to pay (1) the salary stipulated when there is an agreement, (2) if there is no express stipulation the minimum wage fixed for the occupation, industry or business in question, as when a mandatory decree of the Minimum Wage Board governs, and (3) in default of such determination, the wages that are customarily paid in the locality for similar work.

The very language used in the statute leads us to that interpretation. Where the act states "If there is no express stipulation as to wages, *the employer shall be obliged* to pay the minimum wage, etc. . . . .", it implies that it shall be the obligation of the employer to pay the wages which he has stipulated with his employees. (Italics ours.) In other words, the obligation to pay the minimum wage fixed for the occupation, industry or business and, in default of such determination, the wages that are customarily paid in the locality for similar work, arises where there is no express stipulation as to wages. If there is, the stipulation governs and the law compels the employer to comply with it, or else incur the liability pointed out in § 13.

It may be held, therefore, that the stipulated wages, the minimum wage fixed for the occupation, industry or business in question and, in default of either of these, the wages that are customarily paid in the locality for similar work, is the compensation fixed by Act No. 379 for regular hours of work. Consequently, the failure to pay the wages in any of these three cases entitles the employee to recover under § 13 of the Act.

█ █ Where there is an express stipulation as to wages, as here, if the employer fails to pay his employees the stipulated wages he shall be bound to pay them, in addition to the unpaid sum, an equal sum as liquidation of damages in addition to the costs, expenses and attorney's fees. This is so because the provision of § 13 as well as other such provisions of the aforesaid Act No. 379, such as the one fixing the legal working day, the one providing compensation at double the rate for extra hours of work, the one declaring that the additional compensation on the basis of double time for extra hours of work may not be waived, etc., form a part of and must be considered as incorporated into the labor contract since any agreement to the contrary between the employer and his employees is superseded by the statute. *Sierra, Commissioner* v. *San Miguel*, 70 P.R.R. 573, and *Caguas Bus Line* v. *Comm'r of Labor*, 73 P.R.R. 690.

The third assignment of error will be dismissed.

For the foregoing reasons, the judgment appealed from will be reversed and the complaint dismissed as to the petitioners Pedro Díaz, Santiago Collazo and Miguel Alers. As to the petitioners Dionisio Salcedo and Tomás Collazo, said judgment will be affirmed.

Mr. Chief Justice Snyder and Mr. Justice Sifre dissent as to the imposition of liquidated damages under § 13 of Act No. 379 of 1948.

---

MR. JUSTICE BELAVAL, concurring.

I agree entirely with the opinion delivered by my colleague Mr. Justice Pérez Pimentel. Since Act No. 379 of May 15, 1948, of rather recent adoption, presents a new problem in the matter of the penalty prescribed by § 13, I wish to add the results of my own personal study of the question. The case deals with a collective bargaining agreement where an employer pays to certain workmen, for regular working hours, a rate lower than the one stipulated in the agreement.

Act No. 379 of May 15, 1948 (Sess. Laws, p. 1254) *is a law of general application to every labor contract*, since it governs "in every commercial, industrial, and agricultural establishment; in every shop, factory, central, mill, and manufactory; in every ranch, property, farm, estate, and plantation; in every public-service enterprise; in every gainful business, including printeries, publishing houses, newspaper enterprises, clinics, hospitals, pharmacies, teaching institutions, boarding houses, hotels, eating houses, restaurants, stores, groceries, warehouses, depots, markets, garages, bakeries, theatres, racetracks, casinos, and other similar businesses; in every business office or establishment, law office, consulting room, and professional office, and in every place devoted to the rendering of service of any kind through payment. The provisions of this Act shall also be applied to all chauffeurs and drivers of public and private

motor vehicles, except those who work on a commission basis." . . . . (§ 16.)

The labor contract is defined as "every oral or written agreement by which the employee binds himself to execute a work, perform labor, or render a service for the employer for a wage or any other pecuniary remuneration. *If there is no express stipulation as to wages*, the employer shall be obliged to pay the minimum wage fixed for the occupation, industry, or business in question, and, in default of such determination, the wages that are customarily paid in the locality for similar work." (§ 19, subtopic "Labor contract".)

Although Act No. 379 does not repeal the Act creating the Minimum Wage Board; the Act regulating the work of women and children in dangerous occupations; that regulating the employment of minors; that establishing the closing of commercial and industrial establishments; or that prescribing the day of rest (§ 22); and although it does not include the industries covered by the Fair Labor Standards Act of June 25, 1938, enacted by the U. S. Congress, in all that which may be specifically provided as to hours, minimum wages and regulations peculiar to said industries, it in nowise excludes from its application any violation of said labor contracts where the general provisions of Act No. 379 are not in conflict with the provisions of said special Acts. That is why it provides that "extra" hours are those worked by the employee in the service of his employer in excess of the maximum working hours a day as the Minimum Wage Board may have fixed for the industry in question, the hours worked by an employee in the service of his employer during the days or hours in which the establishment must remain closed and the hours that the employee works for his employer during the day of rest (§ 4.) As to the industries covered by the Fair Labor Standards Act, it is well known that § 18 of the Federal Act permits the application of the state laws if they provide

for higher standards for the employee or workman than the Fair Labor Standards Act. *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250, 273, 276 (Snyder) (1948). It should be noted that Act No. 379 forbids the promulgation of any future decree, written contract or oral agreement that fixes a working day of more than eight hours of work. (§ 6)

In adopting Act No. 379 the former Legislature of Puerto Rico combined the method of the wage-rate, without fixing it numerically, of the Act of July 1, 1931, concerning the working day of Spain, with the extra hours method, a system of additional penalty and fiscalization of the employer's pay roll by the Fair Labor Standards Act, (29 U.S.C.A. 1 *et seq.* § 203 *et seq.*) remodernizing, in turn, some of the old provisions on permits for special jobs of the former Act No. 49 of August 7, 1935. *Leyes Sociales de España*, p. 169. (*Instituto Editorial Reus*, 1951 ed.) As to wage rates, Act No. 379 first established an ideal wage rate: the wages paid by the employer during the month of January 1948 (§ 11), forbidding any employer to reduce the wage paid by him in order to accommodate it to the payment of regular hours as well as of the extra hours of work. Then it fixed the method for determining the rate by dividing the wage received by the number of regular hours worked. The fact that a progressive minimum wage was not fixed, as it was by the Fair Labor Standards Act, does not mean that it intended to leave without regulation everything concerning wages for regular hours. The Legislature of Puerto Rico, after fixing an ideal wage rate, that prevailing in January, 1948, preferred to authorize the variable fixation of the wages for regular hours either on the basis of an economic study carried out by a governmental agency, as to the establishment of a minimum wage, or by means of collective bargaining agreements entered into by labor unions or contracting units recognized pursuant to the provisions of the Labor Relations Act, and even by means of voluntary contracts between employers and employees, but for the last

three cases, which are those not covered by the governmental action of the Minimum Wage Board, it fixed not only the number of hours that each employee or workman should work, but also the method for computing in each labor contract the wage-rate, both for the regular and the extra hours. This is what appears from §§ 5, 6, 7 and 8 of Act No. 379.

As may be seen, Act No. 379 is not strictly speaking, an Act of extra hours alone, as was Act No. 49 of August 7, 1935, which it repealed. The reason that Act No. 49 was merely an Act providing for working hours is that in 1935 it was still believed that any provision fixing a minimum wage or a wage-rate would be unconstitutional, because it would be a deprivation of the freedom of contract. It was not until the U. S. Supreme Court decided the case of *West Coast Hotel* v. *Parrish*, 300 U. S. 379, 392, 393, 81 L. ed. 703, 709 (*Hughes*) (1937), that the exercise of the power of the state to protect the health and safety through regulation of the wages in labor contracts was declared constitutional. That is why Act No. 379 regulated not only the hours of the working day but also the wage-rate, both the regular and extra hours.

Although Act No. 379 partakes of the character of a state law, it covered in our Island the same field covered by the Fair Labor Standards Act on interstate activities. The Fair Labor Standards Act has three main objectives: (1) to establish minimum wages; (2) to discourage the employment of workers for long hours by providing that wage payments for all hours in excess of the statutory minimum shall be at a rate not less than one and one-half times the regular rate; (3) to discourage the employment of child labor: See "The Supreme Court and Fair Labor Standards," E. Merrick Dodd, 59 Harv. L. Rev. 321, 371. We have already seen that the purposes of Act No. 379, according to its title are: (1) to establish the working day in Puerto Rico; (2) to provide for the payment at a double rate for the hours worked in excess of the working day; (3) to fix the days of

rest; (4) to regulate certain aspects of the labor contract; (5) to impose certain duties on the employers and (6) to fix penalties for the violation of the provisions of said Act.

The analogy existing between the Fair Labor Standards Act and our Act No. 379, as to the purpose of discouraging the long working day, is perfectly clear from the Statement of Motives of Act No. 379 which reads: "It is the policy of this Act to limit to a maximum of eight hours the legal working day in Puerto Rico, and to provide payment of double time for the hours worked in excess of the legal working day. Experience shows that a prohibitive provision is not sufficient to secure the limitation in question. The penalty imposed on the employer who violates the prohibitive provision, does not benefit the employee or recompense him for his effort when the day's work is extended. The payment, by act of law, of double time for the hours worked in excess of the legal working day is more effective and practical. Such measure, *while discouraging employment* during extra hours because of the additional financial burden which it imposes on the employer, carries with it a more equitable compensation for the man compelled to work for a longer period."

From an examination of the Act creating the Minimum Wage Board of Puerto Rico, Act No. 379 of May 15, 1948, and the Acts regulating the work of women and children in dangerous occupations and regulating the employment of minors, providing also for compulsory public school attendance, it may be noted that the former Legislature of Puerto Rico has covered the same field in these laws as did the Fair Labor Standards Act. The only difference being that, instead of doing it all under a single Act, it did it in different Acts, but since they are laws *in pari materia*, we must apply the rule of legal hermeneutics set forth in § 18 of the Civil Code of Puerto Rico which provides: "Laws which refer to the same matter, or whose object is the same, shall be interpreted with reference to each other, in order that what

is clear in one may be employed for the purpose of explaining what is doubtful in another."

Any law may be rationalized in one way or another. The object pursued is that the rationalization be as just and legal as possible within the purposes inspiring the Act.

In every labor contract, generally speaking, the aim of the State is to give the laborer a fair compensation, for the regular as well as the extra hours of work. The laws of minimum wage, or of wage-rate, or of wages comparable to those customarily paid in the locality where the work is performed, (§ 19, sub-topic "labor contract") are intended to guarantee a fair compensation for the regular hours of work. The laws referring to the working day are intended to guarantee a fair compensation "for the man compelled to work for a longer period."

The correlation between regular hours of work and extra hours is so narrow that it cannot be conceived that a law which does not determine what are regular hours, defines what are extra hours. The same thing holds with regard to wages: if the wages for regular hours are in no way established, there would be no way for determining the wages for extra hours.

The compensation for damages for a violation of a labor contract is only a coercive means included in a law to compel fulfillment of its purposes. Would it be fair to think that the Legislature agreed to punish the employer who should fail to comply with the provisions on extra hours, but was content not to punish him for failing to comply with the provisions on regular hours? In view of the compensation provided in § 13 of Act No. 379, would it be legal to distinguish on our own account, although the law makes no distinction, between regular hours and extra hours, notwithstanding the clear letter of the statute which reads: "Any employee who receives a compensation less than that fixed by this Act for regular hours and extra hours of work shall

be entitled to recover from his employer, through civil action, the sums unpaid, plus an equal sum as liquidation of damages"?

Act No. 379 fixes compensation for regular hours of work. Section 3 establishes what are regular hours of work. Section 5 establishes the method of computing the compensation for regular hours by dividing the daily, weekly, or monthly wages or wages otherwise stipulated, by the number of regular hours worked, in accordance with the provisions as to hours of Act No. 379. In the absence of an express stipulation as to wages, the minimum wage fixed for the occupation, industry or business in question by the Minimum Wage Board shall be employed as a basis for compensation for regular hours. (§ 19 sub-topic "Labor contract.") If there is no express stipulation by the parties as to wages, or the wages are not fixed by the Minimum Wage Board, the basis for compensation will be "the wages that are customarily paid in the locality for similar work." (§ 19, same subtopic.) Therefore, it cannot be contended that the law does not fix compensation for regular hours. If it did not, it would have no basis to fix compensation for extra hours.

The compensation for damages contained in Act No. 379 is identical with that contained in the Fair Labor Standards Act and the Act creating the Minimum Wage Board. The legislative purpose behind those compensations is to prevent the evasion in the fulfilment of labor contracts. Since the statutes involved are remedial Acts tending to promote the general welfare of the community, the same must be liberally construed in favor of the subject of law for whose benefit they have been enacted, in these cases the laborers. Section 13 of Act No. 379 is a statutory provision of a substantive as well as of an adjective nature of general application to every labor contract, since almost all the aspects of the labor contract not regulated by special laws are covered by Act No. 379.

The possibility has been suggested that the penalty for a violation in the payment of regular hours in those industries which are covered by a mandatory decree of the Minimum Wage Board, be based on the minimum wage rate per regular hour fixed in the decree and not on the higher wages per regular hour fixed in the collective bargaining agreement or in the written or oral contract entered into between the parties. The situation is analogous when dealing with extra hours. In case of extra hours it has been held that the compensation must be computed on the basis of the agreed wages and not on the minimum wages. *Overnight Motor Transp. Co.* v. *Missel*, 316 U. S. 572, 86 L. ed. 1682, 1687, 1688 (Reed) (1942). We see no reason for making a contrary distinction in the case of regular hours, which are the hours that serve as a basis for the computation of the extra hours. It is well known that the minimum wage is not a top wage; and therefore should not serve as a basis for the computation of hours if the parties have agreed upon another compensation.